**IN THE UNTIED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION**

WALTER EARL DODD, JR.,                    )
                                          )
    Plaintiff,                        )
                                          )          No. 1:12-cv-0087
v.                                        )          Chief Judge Haynes
                                          )
JERRY SIMMONS,                            )
OFFICER CHARLES PIERCE, and               )
CITY OF CENTERVILLE,                      )
                                          )
    Defendants.                       )

## M E M O R A N D U M

Plaintiff, Walter Earl Dodd, Jr., filed this action under 42 U.S.C. § 1983 against the

Defendants: Jerry Simmons, Charles Pierce, and the City of Centerville, Tennessee, asserting

claims arising out of his arrest by Defendant Pierce and subsequent prosecution. Plaintiff's

principal claim is for violation of his Fourth Amendment rights of the United States Constitution

for his unlawful arrest without probable cause that Plaintiff alleges Defendants Simmons and

Pierce conspired to effect. In addition, Plaintiff contends that these Defendants "indicted,

arrested, and detained without probable cause that he had committed a crime in violation of his

Fourth Amendment rights, and in violation of 42 U.S.C. § 1983." (Docket Entry No. 1,

Complaint at ¶ 41). Plaintiff's related federal claim is that Defendant City of Centerville failed

"to adequately train, supervise and discipline its police officers in order to protect members of

the public, including Defendant Walter Earl Dodd, Jr. from being indicted, arrested, and detained

without probable cause" and that such failure caused Plaintiff's unlawful arrest and prosecution

in violation of the Fourth Amendment. Id. Plaintiff also asserts state law claims of false light,

negligent infliction of emotional distress and intentional infliction of emotional distress against

Defendants Simmons and Pierce.

Before the Court are the following motions: Defendant Jerry Simmons's motion for summary judgement (Docket Entry No. 42), Defendant Charles Pierce's motion to dismiss or for summary judgement (Docket Entry No. 46) and Defendant City of Centerville's motion for summary judgment (Docket Entry No. 38).

In this motion, Defendant Simmons asserts, in essence: (1) that Plaintiff's proof fails to establish any action or inaction by him that deprived Plaintiff of any constitutional right; (2) that Plaintiff's arrest was based upon valid probable cause; (3) that he is entitled to qualified immunity; (4) that Plaintiff failed to plead his conspiracy claim with any degree of specificity against Defendants or to present evidence of such a conspiracy; (5) that Plaintiff's false light claim is time barred and lacks proof that Simmons placed Plaintiff in a false light or damaged Plaintiff; and (6) that Plaintiff fails to present medical or scientific proof for his negligent infliction of emotional distress or intentional infliction of emotional distress claims.

In his motion, Defendant Pierce asserts: (1) that probable cause existed for Plaintiff's arrest; (2) that he is entitled to qualified immunity; (3) that Plaintiff's false light claim is time barred; (4) Plaintiff failed to prove any harm or damages from the affidavit for the arrest warrant; (5) that, as a governmental employee, Plaintiff is immune from liability under the Tennessee Governmental Tort Liability Act ("TGTLA") from Plaintiff's state law claims for negligent infliction of emotional distress; (6) that Plaintiff lacks expert proof of any emotional injury; and (7) that Plaintiff's proof on his intentional infliction of emotional distress claim does not establish the outrageousness required for this claim.

In his responses to Defendants Simmons's and Pierce's motions (Docket Entry Nos. 50

2

and 56), Plaintiff contends, in essence: (1) that based upon their personal friendship and communications on the day of his arrest and Pierce's failure to follow police procedures Simmons conspired with Pierce to effect Plaintiff's arrest without probable cause in violation of the Fourth Amendment; (2) that under his proof, Defendants Simmons and Pierce are not entitled to qualified immunity; and (3) that Plaintiff has submitted sufficient proof establishing the elements of state law claims for false light, negligent infliction of emotional distress, and intentional infliction of emotional distress against Defendants Simmons and Pierce.

In its motion, Defendant City of Centerville asserts, in sum: (1) that Plaintiff's proof does not establish a constitutional deprivation and thus, the City of Centerville cannot be liable; (2) that Plaintiff failed to prove any City custom or policy of the inadequate training or supervision of its police officers; (3) that Plaintiff's current failure to train claims were not pled and Plaintiff asserts new failure to train claims; and (4) that Plaintiff cannot recover punitive damages against the City of Centerville.[1]

In response to the City's motion (Docket Entry No. 61), Plaintiff argues that his proof establishes that the City of Centerville failed to train its officers regarding the police department code of ethics and their obligations to disclose exculpatory materials and that his proof shows the City's systematic indifference to constitutional requirements for lawful arrests.

Also , before the Court are Defendant Pierce's motions for entry of an order on certain

---

[1]Defendant City of Centerville also moved for summary judgment as to Plaintiff's state law claims. From the face of the Complaint, Plaintiff does not appear to assert state law claims against this Defendant. Moreover, Plaintiff did not address these claims in his response. Therefore, to the extent that Plaintiff may have originally asserted state law claims, the Court deems the state law claims for false light, negligent infliction of emotional distress, and intentional infliction of emotional distress against the City of Centerville to be abandoned.

3

facts in Plaintiff's response to Pierce's statement of undisputed facts disputed (Docket Entry No. 78) and to exclude Plaintiff's "statement of undisputed facts", or, alternatively response to Plaintiff's statement of undisputed material facts (Docket Entry No. 81) and Plaintiff's responses (Docket Entry No. 82). The Court carefully considered the testimony presented and exhibits submitted in accordance with the Federal Rules of Evidence and the Local Rules in determining the relevant factual record. Accordingly, the Court concludes that these motions should be denied as moot.

For the reasons set forth below, the Court concludes that Defendants' motions for summary judgement should be denied. Plaintiff's proof on his federal claims presents sufficient evidence that Pierce omitted material and exculpatory evidence from his affidavit presented to the state magistrate for Plaintiff's arrest warrant and violated city police procedures in applying for the arrest warrant. The Defendants did not challenge the legal sufficiency of Plaintiff's civil conspiracy claim. Plaintiff also presents sufficient evidence of discussions between Pierce and Simmons as well as Simmons's response to Plaintiff's arrest from which a trier of fact could find a conspiracy between Pierce and Simmons to cause Plaintiff's arrest. Under the applicable law, Simmons and Pierce can be held liable if the jury finds that either influenced Plaintiff's arrest. Plaintiff's proof against the City of Centerville could support a finding of a lack of training by the City on its policies governing arrests by its police officers. The Court, however, declines to exercise its supplemental jurisdiction over Plaintiff's state law claims, particularly given that TGTLA may govern such claims and TGTLA vests exclusive jurisdiction over TGTLA claims in the state court. Beddingfield v. City of Pulaski, 666 F.Supp. 1064 (M.D. Tenn. 1987), *rev'd on other grounds* 861 F.2d 968 (6th Cir. 1988).

4

## A. REVIEW OF THE RECORD[2]

### 1. The McDonald's Incident

Jonathan Merle Dodd, Plaintiff's son, had a child with Jennifer Racheal Simmons, the daughter of Defendant Jerry Simmons. (Docket Entry No. 51, Plaintiff's Response to Defendant Charles Pierce's Statements of Undisputed Facts, at ¶¶ 20-21, 23-24). Pamela Simmons is the wife of Jerry Simmons and the mother of Jennifer Rachel Simmons. Id. at ¶¶ 27-28. Cory Chandler is the natural son of Pamela Simmons and step-son of Jerry Simmons. Id. at ¶ 57.

Since the birth of the child, acrimonious family issues arose between the Simmons and Dodd families. Id. at ¶ 30. After the child's birth, disputes over the child's name, child support, and visitation arose. (Docket Entry No. 60-3, Merle Dodd deposition at 8, 19-20; Docket Entry No. 60-4, Brenda Dodd deposition at 11-12; Docket Entry No. 60-1, Plaintiff deposition at 10).[3] After a court hearing on visitation, Jonathan Merle Dodd was awarded visitation on Saturdays. (Docket Entry No. 60-3, Merle Dodd deposition at 6-7). On Saturday October 22, 2011, Jonathan Merle Dodd's visitation with his child was cut short when the Simmons family members expressed that they had to leave early to attend a military dinner for Josh Bradley,

---

[2]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The evidence must also be viewed in a light most favorable to the nonmoving party. Because there are material factual disputes, this section does not constitute findings of fact under Fed. R. Civ. P. 56(a).

[3]For uniformity of reference, the evidentiary references are to the pagination in the Court's electronic case filing system.

Racheal Simmons's boyfriend. Id. at 21.

According to Plaintiff's proof, thereafter Jonathan Merle Dodd and Tiffany Parker Sharp, his girlfriend, went to McDonald's for lunch. Id. at 24. After receiving his food from the drive through service at the McDonald's, Jonathan Merle Dodd parked his vehicle and noticed the Simmons family dining inside McDonald's. Id. at 3, 12-13, 24-26, 28-29, 33-35). According to Jonathan Merle Dodd, Justin Cory Chandler, Jennifer Simmons' half-brother, exited the McDonald's restaurant hollering and cursing at him. (Docket Entry No. 60-4, Brenda Dodd deposition at 3-5, 29). Jonathan Merle Dodd testified that Cory Chandler retrieved nunchucks, a weapon, from his vehicle. (Docket Entry No. 60-3, Merle Dodd deposition at 27). Sharp entered McDonald's and asked an employee to call the police. Id. at 14-15. Jonathan Merle Dodd called his mother at home. Id. at 3. Defendants' proof is that Racheal Simmons called the police. (Docket Entry No. 38-13, Call Card; Docket Entry No. 62, at ¶ 7).

After her son's telephone call about this incident, Brenda Dodd called her husband, who was at a nearby store. (Docket Entry No. 60-3, Merle Dodd deposition at 16). According to Plaintiff, upon his arrival at McDonald's, he took his gun out of its holster, placed it in a hideaway seat in his car, and entered the McDonald's restaurant. (Docket Entry No. 60-1, Plaintiff's deposition at 18; Docket Entry No. 60-4, Brenda Dodd deposition at 8, 10). Once inside, Plaintiff told his son to leave to avoid confrontation. Id.; Docket Entry No. 60-3, Merle Dodd deposition at 17. Plaintiff told Nicole Hodges, who was pregnant, to sit to avoid needless aggravation and stress. (Docket Entry No. 60-1, Plaintiff deposition at 19). Plaintiff advised Pam Simmons to stop arguing for the grandchild's sake. Id. Plaintiff states that he did not threaten Cory Chandler at McDonald's. (Docket Entry No. 60-1, Plaintiff deposition at 28).

6

Danny Roberts and Shane Witherspoon, City of Centerville police officers, responded to a dispatcher's call about this McDonald's incident, (Docket Entry No. 64, Witherspoon Affidavit at ¶ 2), and remained at McDonald's for approximately 11 minutes. (Docket Entry No. 60-5, Carroll deposition at 12, deposition exhibit 11). In response to an officer's question, Plaintiff admitted that he had a permit to carry a weapon. (Docket Entry No. 60-1, Plaintiff deposition at 21). Plaintiff testified that his handgun was secured in his truck prior to his arrival at McDonald's. (Docket Entry No. 66-1, Plaintiff deposition at 18.). Witherspoon observed that Plaintiff's holster was empty and did not see Plaintiff with a weapon. (Docket Entry No. 64, Witherspoon Affidavit at ¶ 7). Plaintiff explained to the officers that he intended to calm down the argument between Cory Chandler, Rachael Simmons, Pam Simmons and his son. (Docket Entry No. 60-1, Plaintiff deposition at 21). Pam Simmons, Racheal Simmons and Cory Chandler told Roberts that they had a verbal exchange with Earl Dodd and that Earl Dodd had a gun on his side before the officers' arrival. (Docket Entry No. 51, at ¶ 83; Docket Entry No. 57, at ¶ 21; Docket Entry No. 38-22, Roberts trial testimony, at 4; Docket Entry No. 80-2, Roberts Affidavit at ¶ 5). Pam Simmons, Racheal Simmons and Cory Chandler stated that Plaintiff did not threaten them with his gun, but had his hand resting on his gun during the verbal exchange. (Docket Entry No. 51, at ¶ 84).

After their interviews of the principal witnesses, Witherspoon and Roberts determined that only an argument occurred without threats of injury, did not arrest anyone, and did not complete an offense report. (Docket Entry No. 64, Witherspoon Affidavit at ¶ 8; Docket Entry No. 38-22, Roberts Testimony at 6-9). Roberts advised all principals to stay away from each other. (Docket Entry No. 38-22, Roberts Testimony at 6-7). Roberts, however, advised Racheal

7

Simmons "to seek an order of protection against [Plaintiff] to keep him away from her until they could resolve this matter in court since this has been an ongoing issue and . . . she was afraid of him." (Docket Entry No. 51 at ¶ 85). Roberts did not prepare an incident report because he viewed the incident as a verbal argument. (Docket Entry No. 38-22, Roberts Testimony at 8). Absent action by the responding officer, an incident report is not prepared. (Docket Entry No. 60-5, Carroll deposition at 13). Ronnie Carroll, the City's acting police Chief, stated that Roberts and Witherspoon had full authority to arrest an offender at the scene of the McDonald's. Id.

## 2. Plaintiff's Arrest

Later, Jerry Simmons had discussions with his daughter, who on October 24, 2011, went to the City's justice department to petition for an order of protection. (Docket Entry No. 60-2, Jerry Simmons deposition at 17). At 1:05 p.m. on October 24th, Jennifer Rachael Simmons obtained ex parte orders of protection against Walter Earl Dodd, Jr., Merle Dodd, and his girlfriend, Tiffany Parker Sharp. (Docket Entry No. 60-8, Nicholson deposition at 4-5). Racheal Simmons's application for a protective order against Plaintiff, (Docket Entry No. 57 at ¶ 6), asserted:

> We where at McDonald's having lunch on Sunday, October 23, 2011. When Merle Dodd + his girlfriend pulled in. They seen that we was here and about 5 different cars of his friends started pulling up and then here come Merles dad, Earl Dodd. We tried to leave when they started threatening all of us and started walking toward us. Merles Dad came up and had a gun on his side with his hand on his gun to whole time this was going on. We had tried to leave but they blocked us in. So we called the police. Earl had threatened my Brother, telling him that he was going to take care of him one way or another. We all was scared, didn't know what was going to happen.

(Docket Entry No. 51 at ¶ 38). The Hickman County General Sessions Court issued a temporary

order of protection, and set a hearing for November 9, 2011. (Docket Entry No. 57 at ¶ 12).

After issuance of the protective order, Rachael Simmons, Cory Chandler and Pam Simmons went

to the Hickman County Sheriff's Department to discuss the McDonald's incident with an officer.

(Docket Entry No. 57 at ¶ 7). As discussed infra, that officer was Pierce.

On Monday, October 24, 2011, Defendant Simmons met Pierce, a personal friend, for

breakfast. (Docket Entry No. 60-6, Pierce deposition at 35; Docket Entry No. 60-11, Pierce

phone records at 4; Docket Entry No. 60-7, Bohn deposition at 6). Pierce's cellular phone

records for October 24, 2011, reflect a two minute call to Simmons's cell phone at 7:18 a.m.

(Docket Entry No. 54-11, Pierce's cell phone records, at 4). Pierce knew of the issues between

the Dodd and the Simmons families after Plaintiff's son fathered a child with Jennifer Simmons.

(Docket Entry No. 60-6, Pierce deposition at 8). Pierce, who usually works the 6:00 a.m. to 2:00

p.m. day shift, Monday through Friday was on shift on Monday, October 24, 2011, with

Simmons. (Docket Entry No. 51, at ¶¶ 4, 17-18; Docket Entry No. 60-2, Jerry Simmons

deposition at 23-24). The record is unclear if Pierce and Defendant Simmons were the only

officers on duty at that time. (Docket Entry No. 54-6, Pierce deposition at 16; Docket Entry No.

54-2, Jerry Simmons deposition at 24). Defendant Simmons responded to the dispatcher's

report about the Simmons family members' complaint. (Docket Entry No. 51 at ¶ 49). The

parties dispute whether Defendant Simmons responded shortly after the dispatch call or whether

he was at the jail. Id. at ¶¶ 49-50.

Simmons made a one minute call from his cell phone to Pierce's cell phone at 1:00 p.m.

that day. (Docket Entry No. 54-11, Pierce's cell phone records, at 4). At 1:33 p.m., a telephone

call card report reflects that Kimberly Halbrook dispatched Badge 510 (Jerry Simmons) to the

9

jail for a walk-in complaint, but Jerry Simmons was already at the jail. (Docket Entry No. 60-5,

Carroll deposition at 10-11, deposition exhibit 10; Docket Entry No. 60-2, Jerry Simmons

deposition at 28). At 1:35 p.m., Jerry Simmons called Pierce on his personal cellular phone

requesting Pierce to come to the jail and take statements from his family members. (Docket

Entry No. 60-6, Pierce deposition at 3; Docket Entry No. 60-2, Jerry Simmons deposition at 13).

Pam Simmons and Cory Chandler told Pierce that they wanted to charge Plaintiff with

aggravated assault. (Docket Entry No. 60-6, Pierce deposition at 10). Pierce and Simmons deny

any discussion between them about the McDonald's incident prior to Pierce's meeting with Pam

Simmons and Chandler on October 24, 2011. (Docket Entry No. 57 at ¶¶ 18-19, 26).

At the jail station, Pierce interviewed Pam Simmons, Cory Chandler, and Rachael

Simmons. (Docket Entry No. 62 at ¶ 16). Pam Simmons and Cory Chandler also provided

Pierce with written statements about the McDonald's incident. Id. at ¶ 17. In her written

statement, Pam Simmons asserted:

> We all were sitting in McDonald's eating lunch when Merle Dodd and his
> girlfriend pulled in. They circled McDonald's parking lot several times and a lot
> of Merle's friends started pulling in. We tried to leave when all of them started
> threatening us. Merle's dad, Earl Dodd, then came pulling in and jumped out of
> his truck. He then started in on Cory threatening that he would take care of him
> one way or another. He walked up to Cory with his hand on his gun and one hand
> on his private area. We all tried to leave but they blocked us in and then we called
> the police. Officer Witherspoon + Danny Roberts came out. Earl Dodd had a gun
> on his side and we were scared and didn't know what was going to happen to us.

(Docket Entry No. 38-5).

In his written statement, Cory Chandler asserted:

> I Justin Chandler was w/my mom, 2 sisters little sister's baby and her boyfriend
> eating lunch at McDonald's on Sat. Oct. 22, 2011. My little sister exboyfriend
> showed up circling the parking lot a few different times as we were leaving all his

10

buddy showed up along w/Merle Dodd's Dad Earl Dodd. As we came out the door to leave Merle an his buddy's were yelling an making threats to me and my family. Then Earl Dodd came running up like he wanted to fight me and keep making threats. He Earl put his hand on his gun on his side as he had his other hand on his private parts. Earl told me that I had it coming and as he had his hand on his gun. Earl told me he would take care me anyway it took/anyway he could no matter what he had to do. My mother Pam told everyone the law was on their way out and Merle and all his buddys left and Earl ran to his truck and put his gun in there. Then Earl before the officers got there he Earl tryed to fight me again and my mom and sister stepped in between us. Then Earl got in his truck pulled out and stopped to block my mom and sister in from leaving as he got back out of his truck 2 officers showed up. The 2 officers were Shane Witherspoon and Danny Roberts.

(Docket Entry No. 38-6). Pierce considered these written statements as consistent with the

information Chandler and Simmons provided to him at the jail. (Docket Entry No. 51 at ¶ 75).

Pierce told the Simmons's family members that he would speak with Roberts and Witherspoon

about the McDonald's incident. Id. at ¶ 77.

Pierce talked to Roberts and requested Roberts to prepare a report on the McDonald's

incident. Roberts hand-delivered his report to Pierce that day, October 24, 2011. (Docket Entry

No. 80-2, Roberts Affidavit at ¶ 8). In his report, Roberts wrote:

On October 22nd, 2011, at approx. 1526 hrs., I, Officer Danny Roberts was dispatched to McDonald's Restraunt on apparent disturbance call. Upon my arrival I spoke with a Ms. Rachael Simmons whom stated to me that she and her family had arrived at the restraunt to eat and that the father of her child Mr. Mearl Dodd had arrived at the restraunt and began to yell and cuss at them. She said that he did threaten her and her family and that when she stated that they were calling the police that he had left the scene. His father was at the scene a Mr. Earl Dodd. I did observe a empty hand gun holster on his side. I did ask him if he had a hand gun carry permit in which he stated that he did. He did give me his permit in which I did run through dispatch and verify that it was valid. I did ask him if he had the hand gun with him and he did state to me that it was locked in his vehicle. **Rachael and her mother Pam Simmons along with her brother Cory Chandler did state to me that they had had a verbal exchange with Mr. Earl Dodd also and that his gun was on his side during this, before our arrival. They did state that Mr. Dodd did not threaten them with this gun but did**

**have his hand resting on this weapon during the exchange of words.** I did advise Rachael to seek an order of protection against Mr. Dodd to keep him away from her until they could resolve this matter in court since this has been an ongoing issue and that she stated that she was afraid of him. Mr. Earl Dodd did state that he was going to have a talk with his son Mearl and put a stop to his harassment of Ms. Simmons and her family. Mr. Chandler did state that he and Earl had an exchange of words also. I did advise both parties involved to stay away from each other until court. End of Report.42

(Docket Entry No. 80-2, Roberts Affidavit at 4-5) (emphasis added).

When asked about Pierce's contact with him about the McDonald's incident, Roberts

testified as follows:

Q. And did you plan on charging anyone with any type of crime, based on what your investigation showed?

A. No, Sir.

Q. Did you -- after this was over with, did you go back to the police department and write a report as to what incident had taken place there at the McDonald's?

A. No, Sir.

Q. Now, can you tell us why there wouldn't have been a report generated?

A. On a verbal incident where it's just he said/she said, we usually don't do reports on it. In the past we didn't. Now we're doing community service reports, where if we have contact with someone, we'll we'll write up a small narrative, but at that time we did not.

Q. Okay. Now, a couple days later did you receive a request for a report to be done regarding the events that took place on October 22nd?

A. Yes, Sir. Officer Charles Pierce asked me if I'd write him a statement to what happened.

Q. Okay.

A. -- so that's basically what I done.

Q. And you did write that report?

12

A. Yes, Sir.

Q. Okay. Or you wrote a statement out?

A. I wrote a statement out, which was turned into my report later when I was asked by Lieutenant--which was interim chief at the time--Ronnie Carroll wanted me to turn that into a report.

Q. Okay. And you did so?

A. Yes, Sir.

Q. Now, as a part of writing this report, did Detective Pierce tell you that Corey Chandler wanted to press charges?

A. Yes, Sir.

Q. All right. And did he tell you -- well, scratch that After you wrote that report, did you follow up to see what was taking place as far as what Detective Pierce, or Officer Pierce, was doing with his investigation of this matter?

A. No, Sir, I did not. It was sometime later before I found out what happened.

**Q. Okay. And what did you tell -- what did you tell Officer Pierce whenever he told you that Corey Chandler was wanting to file charges against Earl Dodd?**

**A. I told him there was nothing to file charges for, that no crime had occurred.**

(Docket Entry No. 38-22, at 7-9) (emphasis added). Additionally, Roberts stated that Plaintiff did not threaten either Pam Simmons or Cory Chandler. (Docket Entry No. 60-6, Pierce deposition at 20, deposition exhibit 13).

Defendant's proof is that, in his affidavit, Roberts describes the underlined portions of Pam Simmons's and Cory Chandler's statements as consistent with these statements to him on October 22, 2011:

I Justin Chandler was w/my mom, 2 sisters little sister's baby and her boyfriend

13

eating lunch at McDonald's on Sat. Oct. 22, 2011. My little sister exboyfriend showed up circling the parking lot a few different times as we were leaving all his buddy showed up along w/Merle Dodd's Dad Earl Dodd. As we came out the door to leave Merle an his buddy's were yelling an making threats to me and my family. Then Earl Dodd came running up like he wanted to fight me and keep making threats. He Earl put his hand on his gun on his side as he had his other hand on his private parts. Earl told me that I had it coming and as he had his hand on his gun. Earl told me he would take care me anyway it took/anyway he could no matter what he had to do. My mother Pam told everyone the law was on their way out and Merle and all his buddys left and Earl ran to his truck and put his gun in there. Then Earl before the officers got there He Earl tryed to fight me again and my mom and sister stepped in between us. Then Earl got in his truck pulled out and stopped to block my mom and sister in from leaving as he got back out of his truck 2 officers showed up. The 2 officers were Shane Witherspoon and Danny Roberts.

We all were sitting in McDonald's eating lunch when Merle Dodd and his girlfriend pulled in. They circled McDonald's parking lot several times and a lot of Merle's friends started pulling in. We tried to leave when all of them started threatening us. Merle's dad, Earl Dodd, then came pulling in and jumped out of his truck. He then started in on Cory threatening that he would take care of him one way or another. He walked up to Cory with his hand on his gun and one hand on his private area. We all tried to leave but they blocked us in an then we called the police. Officer Witherspoon + Danny Roberts came out. Earl Dodd had a gun on his side and we were scared and didn't know what was going to happen to us.

(Docket Entry No. 80-2, Roberts Affidavit at ¶¶ 10-11, at 8-9) (emphasis in original).

Pierce states that he did not discuss the McDonald's incident with Witherspoon, the other officer who responded to the McDonald's incident. (Docket Entry No. 60-6, Pierce deposition at 11). Yet, Witherspoon states that Pierce advised him that he was seeking an arrest warrant for Plaintiff for aggravated assault. (Docket Entry No. 64, Witherspoon Affidavit at ¶ 10). Witherspoon responded that he did not understand why Pierce was seeking a warrant because a crime did not occur and an arrest warrant was not proper. Id. Pierce then prepared his affidavit for the arrest warrant, relying only on Pam Simmons's and Cory Chandler's statements. (Docket Entry No. 60-6, Pierce deposition at 9, 25-26).

14

Plaintiff's proof is that Pierce's pursuit of this information from Defendant Simmons's family members about the McDonald's incident was contrary to City police protocol that required Pierce to defer to Roberts or Witherspoon, the officers who responded to the incident. (Docket Entry No. 38-21, Ronnie Carroll trial testimony, at 4; Docket Entry No. 38-12, Carroll deposition at 3-4; Docket Entry No. 60-5, Carroll deposition at 21). Ronnie Carroll, a lieutenant in the City of Centerville's police department, explained that this protocol was to prevent "officer shopping." (Docket Entry No. 38-21 at 4).

Prior to applying for the warrant, Pierce met with Kate Yeager, Assistant District Attorney for Hickman County. (Docket Entry No. 51, at ¶ 86). Defendant Pierce read Pam Simmons's and Chandler's statements and Roberts's narrative to Yeager and requested guidance. (Docket Entry No. 60-6, Pierce deposition at 28-29). After speaking with Assistant District Attorney Yeager,[4] Pierce believed that he was justified in presenting only the statement of Cory Chandler. (Docket Entry No. 60-6, Pierce deposition at 12-13, 28-29). After his conversation with Yeager, Pierce prepared an affidavit for a criminal complaint against Plaintiff for aggravated assault. (Docket Entry No. 62, at ¶ 21).

On or about October 27, 2011, Pierce presented his affidavit to arrest Plaintiff to Magistrate Cindy Bowman with whom Pierce also discussed the complaint. Id. at ¶ 22. Prior to presenting his affidavit, Pierce talked to Magistrate Bowman twice during the week of October 24, 2011, about the McDonald's incident. (Docket Entry No. 51 at ¶ 97). Pierce's affidavit for the criminal complaint reads as follows:

During an investigation it has been found that on or about 10/22/2011 Justin Cory

---

[4]The summary judgment record does not reflect any affidavit from Yeager.

Chandler along with his Mother Pam Simmons, sister Rachel Simmons, sister Nicole Hodgins, and Josh Bradley were at McDonald's Restaurant in Centerville, TN eating lunch. Nicole Simmons's ex-boyfriend, Merle Dodd began circling the restaurant and in a few minutes Mr. Chandler and his family decided to leave. Upon exiting the restaurant Merle Dodd and a group of his friends approached Mr. Chandler and began to make threats toward Mr. Chandler. A few moments later Walter Earl Dodd Jr., father of Merle Dodd approached and began making threats to Mr. Chandler. Mr. Chandler stated that Walter Earl Dodd Jr. said that I had it coming and he would take care of me any way it took. While making the threatening statement Mr. Chandler stated that Walter Earl Dodd Jr. had his hand on a pistol in the holster Walter Earl Dodd Jr. was wearing.

(Docket Entry No. 38-17).

On October 27, 2011, based upon Pierce's affidavit, Magistrate Bowman concluded that probable cause existed for Plaintiff's arrest for aggravated assault and issued the arrest warrant for Plaintiff. (Docket Entry No. 62, at ¶ 23). Magistrate Bowman set Plaintiff's initial hearing for November 15, 2011 to allow time for the Plaintiff to be served the warrant. (Docket Entry No. 42-9, Danna Nicholson deposition at 4-7). After the issuance of the arrest warrant, Pierce was not involved with any legal proceedings against Plaintiff. (Docket Entry No. 51, at ¶ 115).

At a November 9, 2011 protective order hearing involving Simmons's petition against Plaintiff, Shane Davis, court security officer and deputy for the Hickman County sheriff's department, served the arrest warrant on Plaintiff. (Docket Entry No. 57 at ¶¶ 12-13). Davis arrested Plaintiff and transported Plaintiff to the county jail. (Docket Entry No. 62 at ¶ 26). According to Davis, he went to the clerk's office for Plaintiff's arrest warrant, fifteen to twenty minutes before arresting Plaintiff. (Docket Entry No. 42-6, Davis deposition at 5). As to the delay in service of the October 27, 2011 warrant, Davis stated that it "happens all the time" and that the timing in execution of the warrant was not unusual. Id. at 8-9. Davis states that he did not see Defendant Simmons the day he arrested Plaintiff and did not have any discussions about

the warrant until the clerk's office provided the warrant to him. Id. at 4, 6-7, 10. Jonathan Merle
Dodd testified that on November 9, 2011, he observed Defendant Simmons enter the courtroom,
hand Davis a piece of paper, and watched as Davis arrested Plaintiff. (Docket Entry No. 54-3,
Merle Dodd deposition at 10-11).

### 3. The City Investigation of Plaintiff's Arrest

After Plaintiff's arrest, on November 9, 2011, Brenda Dodd, Plaintiff's wife, spoke to
Acting Chief Ronnie Carroll and City Mayor Bob Bohn about the officers' conduct in the
McDonald's. (Docket Entry No. 62 at ¶¶ 27-28). At Bohn's request, Brenda Dodd filed a
written complaint about the McDonald's incident with Bohn, dated November 14, 2011. Id. at ¶
28. Bohn provided a copy of Brenda Dodd's letter to Carroll for inquiry. Id. at ¶ 29. According
to Bohn, Brenda Dodd did not submit any written materials, documents nor videos about the
McDonald's incident to him. (Docket Entry No. 72, Bohn Affidavit at ¶ 5). The McDonald's
surveillance video is not part of the summary judgment record.

Carroll's investigation revealed that Roberts did not place information about the
McDonald's incident into a Tennessee Institute Based Reporting System ("TIBRS") report on the
police data base system. (Docket Entry No. 60-5, Carroll deposition at 6, 14, deposition exhibit
6; Docket Entry No. 60-7, Bohn deposition at 7). Carroll's investigation revealed that Roberts
did not have any field notes on the McDonald's incident. (Docket Entry No. 60-5, Carroll
deposition at 15). The first report on the McDonald's incident was Pierce's supplemental TIBRS
report that lacked a narrative. (Docket Entry No. 60-5, Carroll deposition at 6-7, 9, deposition
exhibit 9). Pierce labeled Roberts's incident report as a supplemental report based upon his
belief that Roberts filed an original report on the McDonald's incident. (Docket Entry No. 60-5,

17

Carroll deposition at 6-7, deposition exhibit 9).

After receiving Brenda Dodd's letter, Carroll met with Pierce for a "broad discussion" and criticized Pierce for not referring Chandler's and Pam Simmons's complaints to Roberts. (Docket Entry No. 62 at ¶ 30; Docket Entry No. 60-5, Carroll deposition at 20-21). Carroll also referred the matter to the District Attorney's office for investigation of whether a false police report was submitted by the Simmons's family members. (Docket Entry No. 54-5, Carroll deposition at 23, 28). The prosecutor's office referred the matter to the Tennessee Bureau of Investigation ("TBI") for investigation. (Docket Entry No. 62 at ¶ 32). Carroll met with the TBI investigator and provided his information, including Brenda Dodd's statement and Robert's report. Id. at ¶ 33. On February 21, 2012, Pam Simmons and Cory Chandler signed sworn statements that they did not see Plaintiff with a handgun during the McDonald's incident, only a holster. Id. at ¶ 34. On February 22, 2012, the prosecution dismissed the criminal charges against Plaintiff. Id. at ¶ 35.

After TBI Special Agent David Harmon interviewed Jerry Simmons about the McDonald's incident, the City of Centerville suspended Defendant Simmons with pay. Id. at ¶ 36. On or around April 4, 2012, Defendant Simmons was indicted on charges of official misconduct and bribery, id. at ¶ 37, and Simmons was later convicted of official misconduct. (Docket Entry No. 60-2, Jerry Simmons deposition at 34).[5] On April 10, 2012, the City of Centerville terminated Defendant Simmons. (Docket Entry No. 62 at ¶ 38) . On February 22, 2012, Plaintiff was terminated from his employment cutting grass for the City of Franklin,

---

[5]The record is not clear as to the alleged conduct that was the basis for the official misconduct charge and conviction.

18

Tennessee. (Docket Entry No. 60-1, Plaintiff deposition at 5-7).

## 4. The City's Policies

As to the City's training of its police officers on arrests, Pierce and Simmons attended the

basic training required by Tennessee law for law enforcement officers and completed the 40-hour

annual in-service training requirement. (Docket Entry No. 62, at ¶¶ 1-2). Plaintiff cites the

following policies on investigations by the City of Centerville police officers:

> 1.60 AUTHORITY AND RESPONSIBILITY OF POLICE OFFICERS
>
> [Police officers] shall investigate all incidents assigned to them, consistent with
> department procedure.
>
> * * *
>
> 2.11 PROHIBITED OR REQUIRED ACTIVITIES
>
> **B. Investigation – Officers shall not withhold information on criminal
> activity or undertake self-assigned investigations without prior ... notification
> of a supervisor.**
>
> * * *
>
> 2.12 SCENES OF INCIDENTS
>
> A. General Responsibilities ... at Crime ... Scene ... **Members officially assigned
> to investigate an ... incident shall ensure ... that a thorough investigation is
> conducted. This shall include ... securing of statements and other information
> which will aid in the successful completion of the investigation ...**
>
> B. Command of Scene ... When two or more officers of the same rank are present
> [at the scene], and one is assigned to the Detail that will conduct the follow-up
> investigation, that officer shall be in charge.

(Docket Entry No. 60-12, Police Department manual, at 19, 50, 53) (emphasis added).

As to City police department protocol for complaints about an incident, Carroll described

that complaints are referred to the officer who responded to the scene of the incident. (Doc.

38-21, Carroll trial testimony at 4). Carroll explained that the purpose of this protocol is to prevent officer shopping. Id. The police policy manual specifically prohibits self-assigned investigations without supervisor approval. (Docket Entry No. 60-12, Policy Manual, §2.11 B. Prohibited Activities, at 50). Here, for investigating Defendant Simmons's family members complaints these complaints should have been assigned to Roberts, the first officer at the McDonald's restaurant. (Docket Entry No. 38-21, Carroll trial testimony at 4; Docket Entry No. 38-4, Pierce deposition at 18). Pierce testified that he did not know the written police department procedures for handling investigations. (Docket Entry No. 60-6, Pierce deposition at 33).

Upon completion of an investigation, the City's department policies for securing an arrest warrant are as follows:

> 3.22 SECURING COMPLAINT AND WARRANT
>
> When no previous warrant exists, it shall be the responsibility of the assigned officer to secure the:
>
> A. Complaint
>
> Alleging the felony offense and naming the suspect as the offender **by presenting all available information and facts to the committing magistrate.**

(Docket Entry No. 60-12, Policy Manual, § 3.22, at 115) (emphasis added).

Plaintiff also cites the City police department's written policies on maintaining records of incidents:

> 702 TIBRS-TENNESSEE INCIDENT REPORT BASED REPORTING SYSTEM
>
> . . . .
>
> VICTIM DATA

20

. . . .

8. Aggravated Assault ...

. . . .

Remember, selections of circumstances should be based on information known to
law enforcement following their investigation... Always select the most
descriptive circumstances as determined by investigations.

(Docket Entry No. 60-12, Policy Manual, at 155, 159, 160).

The City of Centerville's policies and procedures are covered in the police academy

training, (Docket Entry No. 60-2, Jerry Simmons deposition at 36), and are reviewed at in-service

training or other meetings of officers. Id. at 6-7. Yet, the City's police officers are not provided

a complete copy of the City's Police Department Manual or Policy and Procedures and have not

had the opportunity to read them. Id. at 5-7. Any questions related to police department policies

and procedures are answered by supervisors. Id. at 6. Acting police Chief Carroll has limited

authority to enforce the City police department's policy and procedures manual. (Docket Entry

No. 60-5, Carroll deposition at 16-17). In the Chief's absence, complaints about the police

department are referred to Mayor Bohn. Id. at 4. Bohn is not trained on police procedures, but

read the police regulations after his election. (Docket Entry No. 60-7, Bohn deposition at 3).

In addition to its police departmental policies and procedures, the City also has a police

code of ethics that provides, in part:

### LAW ENFORCEMENT CODE OF ETHICS

AS A LAW ENFORCEMENT OFFICER, my fundamental duty is ... to protect
the innocent against deception, ...; and to respect the Constitutional rights of all
people to liberty, equality, and justice.

I WILL ... be constantly mindful of the welfare of others. Honest in thought and

deed ... [and] exemplary in obeying the laws of the land and regulations of my department. ...

**I WILL ... never ... permit personal feelings, prejudices, animosities, or friendships to influence my decisions.**

I RECOGNIZE the badge of my office as a symbol of public faith, and I accept it as a public trust ...

(Docket Entry No. 60-12, at 12) (emphasis added). This code of ethics is incorporated by specific reference into the policy and procedure manual as part of "the standards of the law enforcement code of ethics." Id. at 44.

According to Acting Chief Ronnie Carroll, this code of ethics is only reviewed with officers upon their hiring. (Docket Entry No. 60-5, Carroll deposition at 17). Simmons testified that the code of ethics was presented to him on his first hiring, but its provisions differ from the code of ethics on a plaque at City Hall. (Docket Entry No. 60-2, Jerry Simmons deposition at 8). The police department did not define any consequences for violating the code of ethics. Id. at 8-9.

## B. CONCLUSIONS OF LAW

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the opposing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme

Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary
> judgment "shall be rendered forthwith if the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any, show
> that there is no genuine issue as to any material fact and that the moving party is
> entitled to a judgment as a matter of law." By its very terms, this standard
> provides that the mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only
> disputes over facts that might affect the outcome of the suit under the governing
> law will properly preclude the entry of summary judgment. Factual disputes that
> are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court

defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'"

Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations

omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

Celotex, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery,

the party opposing the motion must make an affirmative showing of the need for additional

discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d

351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970,

971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the

required showing of the respective parties, as described by the Court in Celotex:

23

> Of course, a party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its motion, and
> identifying those portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any," which
> it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e
> find no express or implied requirement in Rule 56 that the moving party support
> its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying

Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving

party's burden is to show "clearly and convincingly" the absence of any genuine issues of

material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting

Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant

has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the

nonmoving party then 'must set forth specific facts showing that there is a genuine issue for

trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the

Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to

overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly

supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479

(6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical
> doubt as to the material facts." Further, "[w]here the record taken as a whole
> could not lead a rational trier of fact to find" for the respondent, the motion should
> be granted. The trial court has at least some discretion to determine whether the
> respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914

F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> . . . .
>
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

> It is likewise true that:
> In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1.    Complex cases are not necessarily inappropriate for summary judgment.

2.    Cases involving state of mind issues are not necessarily inappropriate for

26

summary judgment.

3.      The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4.      This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.      A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6.      As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.      The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.      The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9.      The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.     The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed

upon a motion for summary judgment: (1) has the moving party "clearly and convincingly"

established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Title 42 U.S.C. § 1983 provides a remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution. West v. Atkins, 487 U.S. 42, 48 (1988). The essential elements of a § 1983 claim are: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether the conduct deprives a person of rights, privilege, or immunities secured by the Constitution or laws of the United States. Street v. Corr. Corp. of Am., 102 F.3d 810, 814 (6th Cir. 1996). Here, Defendants, officers and the City, qualify as state actors.

### 1. Plaintiff's Fourth Amendment Claims

Here, Plaintiff's Fourth Amendment claims extend beyond his arrest to include his subsequent prosecution and detention. Plaintiff asserts that these claims arose when Defendant Pierce omitted material facts about the McDonald's incident in his affidavit for the Plaintiff's arrest warrant. For such claims, the Sixth Circuit has stated:

> **"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff."** Voyticky v. Village of Timberlake, Ohio, 412 F.3d 669, 677 (6th Cir.2005); see also Brooks v. Rothe, 577 F.3d 701, 706 (6th Cir.2009). Because an arrest based on a facially valid warrant approved by a magistrate provides a complete defense, Voyticky, 412 F.3d at 677, Sykes, **in order to prevail on a false-arrest claim, was required to prove by a preponderance of the evidence that in order to procure the warrant, Sgt. Anderson "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that**

28

create[d] a falsehood" and "such statements or omissions [we]re material, or necessary, to the finding of probable cause." Wilson v. Russo, 212 F.3d 781, 786–87 (3d Cir.2000) (internal quotation marks omitted); see Vakilian v. Shaw, 335 F.3d 509, 517 (6th Cir.2003) (citing Wilson with approval and noting that in the § 1983 context "an officer or investigator cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant" (internal quotation marks and alteration omitted)); Hinchman v. Moore, 312 F.3d 198, 205–06 (6th Cir.2002) ("Falsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional"). If the affidavit contains false statements or material omissions, we set aside the statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause. Hill v. McIntyre, 884 F.2d 271, 275 (6th Cir.1989) (citing Franks v. Delaware, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)); Burleigh v. City of Detroit, 80 Fed.Appx. 454, 458 (6th Cir.2003) (unpublished opinion) ("This alleged exaggeration of the facts need not detain us, however, if other undisputed facts support the state court's probable cause determination."); cf. United States v. Campbell, 878 F.2d 170, 171 (6th Cir.1989).

Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010) (emphasis added).

For the related claims involving the subsequent prosecution the Sixth Circuit described

the requisite proof:

> The elements of a malicious prosecution claim under § 1983 when the claim is premised on a violation of the Fourth Amendment are as follows:
>
>> First, the plaintiff must show that a criminal prosecution was **initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute.** Second, because a § 1983 claim is premised on the violation of a constitutional right, **the plaintiff must show that there was a lack of probable cause for the criminal prosecution.** Third, the **plaintiff must show that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure.** Fourth, the criminal proceeding must have been resolved in the plaintiff's favor.

Mott v. Mayer, Nos. 11-3853, 11-3855, 11-3996, 2013 WL 1663219, at *7 (6th Cir. April 17,

2013) (quoting Sykes, 625 F.3d at 308–09 (internal quotation marks, citations, and alterations omitted) (emphasis added)).

### a. Plaintiff's Arrest Claim

The threshold issue is whether there was probable cause for Plaintiff's arrest given the omissions from Pierces's affidavit. The Fourth Amendment requires that a law enforcement official have probable cause for an arrest. US. Const. Am. IV. The Supreme Court has explained the essence of probable cause:

> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that '[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' and that the belief of guilt must be particularized with respect to the person to be searched or seized. In Illinois v. Gates, we noted:
>
> > 'As early as Locke v. United States, 7 Cranch 339, 348 (1813), Chief Justice Marshall observed, in a closely related context: '[T]he term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation . . . It imports a seizure made under circumstances which warrant suspicion.' More recently, we said that 'the quanta . . . of proof' appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. Finely turned standard such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trial, have no place in the [probable-cause] decision.
>
> To determine whether an officer had probable cause to arrest an individual, we examine the event leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.

Maryland v. Pringle, 540 U.S. 366, 372 (2003) (internal citations omitted).

"The question [the Court] must answer is ' whether, at the moment the arrest was made, the officers had probable cause to make it-whether at that moment the facts and circumstances

within their knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] has committed or was committing an offense.'" Smith v. Thornburg, 136 F.3d 1070, 1076 (6th Cir. 1998) (quoting Donovan v. Thames, 105 F.3d 291, 298 (6th Cir. 1997)). The Court's review of probable cause is limited to the "totality of circumstances" known to the officer at the time of arrest; this includes all facts known to the officer at the time. Gardenire v. Schubert, 205 F. 3d 303, 318 (6th Cir. 2000). Yet, in applying for the arrest warrant, the Sixth Circuit explained the officer's duty:

> **the initial probable cause determination must be founded on "both the inculpatory and exculpatory evidence" known to the arresting officer,** Gardenhire, 205 F.3d at 318 (emphasis in original); Estate of Dietrich v. Burrows, 167 F.3d 1007, 1012 (6th Cir.1999), **and the officer "cannot simply turn a blind eye toward potentially exculpatory evidence.**" Ahlers, 188 F.3d at 372; see also id. at 371 (noting that **officers may not "make hasty, unsubstantiated arrests with impunity"**); Fridley, 291 F.3d at 873 (**"The officer may not ignore information which becomes available in the course of routine investigations."**). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." Fridley, 291 F.3d at 872 (quotation marks omitted).

Logsdon v. Hains, 492 F.3d 334, 341 (6th Cir. 2007) (emphasis added).

Thus, the state magistrate's issuance of the arrest warrant does not end the inquiry as to the probable cause for arrest. "'[A]n officer or investigator cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant.'" Sykes, 625 F.3d at 305 (citation omitted). In Gregory v. City of Louisville, 444 F.3d 725, 758 (2006), the Sixth Circuit stated that where there is evidence of deceptive practices in establishing probable cause, police officers cannot rely on a judicial determination of probable cause to cure the misrepresentation or omission, citing Yancey v. Carroll County, 876 F.2d 1238, 1243 (6th

31

Cir.1989). This principle holds true for the filing of criminal charges. "As a general rule, 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause.' However, an exception applies 'where the indictment was obtained wrongfully by defendant police officers who knowingly present[ed] false testimony to the grand jury.'" Mott v. Mayer, 2013 WL 1663219, at *7) (quoting Barnes v. Wright, 449 F.3d 709, 716 (6th Cir. 2006) and Cook v. McPherson, 273 Fed.Appx. 421, 424 (6th Cir.2008) and citing Peet v. City of Detroit, 502 F.3d 557, 566 (6th Cir.2007)).

Here, Plaintiff's arrest was for aggravated assault. As to aggravated assault, Tenn. Code. Ann § 39-13-102 provides:

(a)(1) A person commits aggravated assault who:

(A) Intentionally or knowingly commits an assault as defined in § 39-13-101, and the assault:

(i) Results in serious bodily injury to another;

(ii) Results in the death of another;

(iii) Involved in the use or display of a weapon; or

(iv) Was intended to cause bodily injury to another by strangulation or bodily injury by strangulation was attempted; or

(B) Recklessly commits an assault as defined in § 39-13-101(a)(1)[6], and the

---

[6]Tenn. Code Ann. § 39-13-101 defines an assault as follows:
(a) A person commits assault who:
    (1) Intentionally, knowingly or recklessly causes bodily injury to another;
    (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
    (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocation.

assault:

> (i) Results in serious bodily injury to another;

> (ii) Results in the death of another; or

> (iii) Involved the use or display of a deadly weapon.

Tenn. Code Ann § 39-13-102.

Here, Plaintiff cites Pierce's omissions of critical exculpatory evidence from his affidavit for Plaintiff's arrest warrant. To be sure, prior to securing the arrest warrant, Pierce had Roberts's report and the statements from Chandler and Pam Simmons. Yet, Roberts's report was that Plaintiff did not threaten the Simmons family members at the McDonald's restaurant. Roberts and Witherspoon who initially investigated the McDonald's incident, told Pierce that there were not any facts to justify a warrant. Roberts and Witherspoon, who were at the scene did not discern facts to justify a warrant. In addition, the City's police procedure required the officer applying for a warrant to collect information from all sources. Unlike Roberts and Witherspoon, Pierce did not consult Plaintiff nor any members of Plaintiff's family about the incident. Under City procedures, any application for Plaintiff's arrest should have been referred to Roberts. Plaintiff cites Chandler's history of problems with the law as well as his mental illness and learning disabilities that a reasonable police inquiry would have revealed.

Defendants contend that Roberts's and Witherspoons statements are opinions that are not exculpatory evidence. "[A]ffidavits that contained no 'specific facts' but 'are merely conclusory, restating the requirements of the law ... therefore cannot create a genuine issue of material fact sufficient to defeat summary judgment.'" Alexander v. CareSource, 576 F.3d 551, 560 (6th Cir. 2009) (quoting Doren v. Battle Creek Health System, 187 F.3d 595, 598-99 (6th Cir. 1999)). Yet,

33

the objective test for Fourth Amendment claims is premised upon what a reasonable police officer would have done in the circumstances at issue. Here, the statements and acts of Roberts and Witherspoon who were at the McDonald's restaurant, investigated the incident and interviewed the participants, are relevant "information" of what a reasonable police officer would have done. Acting Chief Carroll admitted that the arrest warrant for Plaintiff "did not look right." (Docket Entry No. 60-5, Carroll deposition at 19).

As to Pierce's conversations with Yeager and Magistrate Bowman, as well as Bowman's asserted knowledge of the Simmons and Dodd families's disputes, those conversations and facts are not probative on the probable cause determination that must be based upon the affidavit presented to the judicial officer. As a factual matter, Magistrate Bowman found probable cause "[b]ased on the affidavit complaint." (Docket Entry No. 38-17). As the Supreme Court stated that "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); see also, United States v. Leon, 468 U.S. 897, 923 (1984) (under Fourth Amendment case law, "[s]uppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.").

Based upon Plaintiff's proof, the Court concludes that a trier of fact could find that evidence of a verbal argument by Plaintiff with his hand resting upon his empty holster would not qualify as probable cause for the offense of aggravated assault.

34

As to Plaintiff's conspiracy claims concerning his arrest, Defendants Pierce and Simmons did not challenge the legal sufficiency of Plaintiff's conspiracy claim. With their motions for summary judgment, the Court must consider the proof for this claim. A civil "conspiracy" under § 1983 is an agreement between two or more persons to injure another by unlawful action. Bazzi v. City of Dearborn, 658 F.3d 598, 601 (6th Cir. 2011). To support a civil conspiracy claim under 42 U.S.C. § 1983, the plaintiff must show that: (1) there was a single plan; (2) the alleged coconspirators shared in the general conspiratorial objective; and (3) that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant. Hooks v. Hooks, 711 F.2d 935, 943-944 (6th Cir. 1985). Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy; each conspirator need not have known all of the details of the illegal plan or all of the participants involved. Id. at 944. Circumstantial evidence of agreement among all conspirators may provide adequate proof. Spadafore v. Gardner, 330 F.3d 849, 854 (6th Cir. 2003).

For this claim, Plaintiff cites as circumstantial evidence of the individual Defendants' conspiracy:

(1) Simmons and Pierce meeting for breakfast on October 24, 2011;

(2) Simmons's request of Pierce to handle the investigation;

(3) cellular telephone calls between Officer Pierce and Officer Simmons after subsequent to Rachael Simmons obtaining ex parte orders of protection;

(4) Pierce ignoring the exculpatory evidence of Witherspoon and Roberts,

(5) Pierce's failure to interview McDonald's employees on the scene; and

(6) Pierce's reliance on the questionable account of Cory Chandler.

Of course, the City's police procedures called for Roberts and/or Witherspoon to pursue the Simmons's family members' complaints. Defendant Simmons was convicted of official misconduct involving Plaintiff's arrest. The Court concludes that the trier of fact could find this proof sufficient to establish a conspiracy.

### b. Plaintiff's Malicious Prosecution Claim

For this claim, as stated earlier, Plaintiff must prove the lack of probable cause, the Defendants' involvement in that prosecution, a deprivation of Plaintiff's liberty as a result of that arrest and a favorable result for Plaintiff in that prosecution. Sykes, 625 F.3d at 308–09. For the reasons stated above, the Court concludes that Plaintiff has presented sufficient proof that there was not probable cause for his arrest warrant. Beyond his arrest, Plaintiff was detained and suffered a loss of liberty as a result of the acts and omissions of Simmons and Pierce. Plaintiff's criminal charges were resolved in his favor. Thus, as to Pierce and Roberts, this proof is sufficient for this claim.

### 2. Qualified Immunity

Defendants Pierce and Simmons assert qualified immunity as a defense to Plaintiff's damages claim. Government officials acting in their official capacities are not liable for civil damages if their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); [W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken. Anderson v. Creighton, 483 U.S. 635, 639 (1987) "The statutory or constitutional rights in

question must have been 'so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.'" <u>Cullinan v. Abramson</u>, 128 F.3d 301, 309 (6th Cir. 1997) (citations omitted).

Where a defendant asserts qualified immunity, the plaintiff must show that the defendant is not entitled to qualified immunity. <u>Blake v. Wright</u>, 179 F.3d at 1007. To overcome the qualified immunity defense, the Section 1983 plaintiff must show that the right was clearly established at the time of the violation, <u>Harlow</u>, 457 U.S. at 818, and that "the contours of [the clearly established] right...[were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Anderson</u>, 483 U.S. at 640. Yet, precedent is not required for all § 1983 claims to conclude that the right is clearly established. In a word, immunity from damages does not attach simply because the particular legal requirement "has never explicitly held to apply...in identical circumstances." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 535 n.12 (1985).

For Fourth Amendment claims, in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court set forth its two step approach: first, whether a constitutional violation presented and second, if so, was that right clearly established at the time of the constitutional violation. As the Supreme Court stated:

> We have on several occasions addressed the proper analytical framework for determining whether a plaintiff's allegations are sufficient to overcome a defendant's defense of qualified immunity asserted in a motion for summary judgment. Qualified immunity is a defense that must be pleaded by a defendant official. <u>Gomez v. Toledo</u>, 446 U.S. 635 (1980); <u>Harlow</u>, 457 U.S. at 815. Once a defendant pleads a defense of qualified immunity, "[o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but

37

whether that law was clearly established at the time an action occurred. . . . Until this threshold immunity question is resolved, discovery should not be allowed." Id. at 818.

\* \* \*

In Harlow we said that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." Harlow, supra, at 818 (emphasis added). A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is "clearly established" at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all.

Id. at 231-32 (emphasis added).

In Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court modified Saucier to allow the district court to answer either or both of these two inquiries.

Where a decision has "been questioned by Members of the Court in later decisions and [has] defied consistent application by the lower courts," these factors weigh in favor of reconsideration. Payne, 501 U.S. at 829-830, 111 S.Ct. 2597; see also Crawford v. Washington, 541 U.S. 36, 60, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Collectively, the factors we have noted make our present reevaluation of Saucier two-step protocol appropriate.

On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is ofter appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

Id. at 235-36.

In addition to determining whether an official would believe a right was clearly established, the Court utilizes an "objective reasonableness" standard, judging whether a "reasonable official in the defendant's position could have believed his conduct to be lawful, considering the state of the law as it existed when the defendant took his challenged actions." Lavado v. Keohane, 992 F.2d 601, 606 (6th Cir. 1993) (quoting Poe v. Haydon, 853 F.2d 418,

423 (6th Cir. 1988)).

"Although the absence of a case on point does not necessarily endow a public official with public immunity, 'when this court can uncover only some generally applicable principle, its specific application to the relevant controversy must again have been clearly foreshadowed by applicable direct authority.'" Blake, 179 F.3d at 1007 (internal quotations omitted). Further,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640.

Here, Sykes and the authorities cited therein clearly establish Plaintiff's Fourth Amendment right to be free from arrest based upon the omission of material information from the arrest warrant application. Under those authorities, the individual Defendants owed Plaintiff a clearly established legal duty to make a reasonable inquiry for inculpatory and exculpatory evidence. Here, the trier of fact could find that Pierce presented limited information and omitted material exculpatory information in his affidavit for the arrest warrant for Plaintiff. Pierce's affidavit was contrary to City procedures that required Roberts or Witherspoon to process the Simmons family members' complaint. Although aware of other witnesses to the incident, Pierce did not interview them. Plaintiff's proof of Pierce's disregard of City procedures is evidence of intent and his omissions in his affidavit for the report involved material facts.

To be sure, factual disputes exists on these issues. Although Defendants Pierce and Simmons asserted qualified immunity as a defense, because there are genuine issues of material fact warranting denial of Defendants Pierce's and Simmons's motions for summary judgment,

these defendants may not appeal the Court's denial of their motions. Johnson v. Jones, 515 U.S. 304, 319-20 (1995) ("[W]e hold that a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial.").

### 3. City Liability

Plaintiff asserts several claims against the City of Centerville. Unlike states, municipalities are persons who may be liable under § 1983 for their illegal acts or those of their employees, but only under certain conditions, where:

> [the employee's] action . . . implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers[;]
>
> . . .
>
> [There is] official municipal policy of some nature[; or]
>
> . . .
>
> [The] execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy . . . .

Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690, 691, 694 (1978).

A municipality is subject to liability for "only [those] deprivations [that are] visited pursuant to municipal 'custom' or 'policy'" under § 1983. Okla. City v. Tuttle, 471 U.S. 808, 818 (1985). As to the quantum of proof required to establish liability of local governmental units under Monell, the plurality opinion of four Justices in Tuttle stated:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be

40

attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

Id. at 823-24 (footnote omitted). An isolated act of any employee also does not establish a policy, Sargi v. Kent City Bd. of Educ. 70 F.3d 907, 912 (6th Cir. 1995), but a local governmental entity may be held liable for its employees' acts in the employee's official capacity of which the entity has notice. Brandon v. Holt, 469 U.S. 464, 471-72 (1985).

A claim against a municipality requires proof of "(1) the existence of an unconstitutional policy, (2) the connection of the policy to the municipality itself, and (3) a causal link between the unconstitutional policy and the particular injury alleged." Robertson v. Johnson County, 896 F. Supp. 673, 682 (E.D. Ky. 1995) Moreover, a prerequisite for municipal liability is that the officer's predicate acts must have violated the § 1983 plaintiff's federal rights. In City of Los Angeles v. Heller, 475 U.S. 796 (1986), the Supreme Court upheld the dismissal of a city and its police commission stating that: "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." Id. at 799 (emphasis in original).

For certain claims against a municipality, there are specific evidentiary burdens to satisfy in order to impose § 1983 liability. In City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Court addressed the requisite proof for a § 1983 claim against a municipality for physical injuries allegedly caused by inadequate training of its police officers.

[The] first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation. . . .

***

We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . . [A] municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. . . .

Monell's rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." . . . But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

***

[T]he focus must be on the adequacy of the training program in relation to the tasks that the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes, the fact that they do says

42

little about the training program or the legal basis for holding the city liable.

Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs. Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? ...

Id. at 385, 388-391 (1989) (footnotes omitted).

The Canton standard for municipal liability is an objective one, Farmer v. Brennan, 511 U.S. 825 (1994) that has been characterized as an "obvious[ness] test." Id.. In a word, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390. Deliberate indifference under Canton "refers to indifference to injuries likely to result from a failure to act, not indifference to whether such injuries constitute deprivation of a constitutional right." Garner v. Memphis Police Dep't, 8 F.3d 356, 366 (6th Cir. 1993).

In one instance, a city was held liable for its failure to train its police officers and bestowal of carte blanche authority to its police officers to arrest persons. Rymer v. Davis, 775 F.2d 756 (6th Cir. 1985). More recently in Gregory, the Sixth Circuit reversed a district court's award of summary judgment on a failure to train claim against the City of Louisville where there was evidence that the city failed to train its officers on their obligations to produce exculpatory materials. The Sixth Circuit described this duty as a significant part of police duties with "highly predictable" and "obvious consequences," if such duties are not performed. 444 F.3d at 754. The

Sixth Circuit emphasized that evidence of a city's failure to provide any training on key duties that directly and adversely impact constitutional rights of citizens was sufficient to survive summary judgment. Id.

Here, the City's written policy states that the officer who is "officially assigned to investigate an ... incident shall ensure ... that a thorough investigation is conducted. . . . securing ... statements and other information which will aid in the successful completion of the investigation." (Docket Entry No. 60-12 at 53). Based upon Pierce's affidavit (Docket Entry No. 42-11), Pierce did not interview McDonald's employees, but Brenda Dodd secured a security surveillance DVD and alleged exculpatory written statements from McDonald's employees a few days after the incident. (Docket Entry No. 60-4, Brenda Dodd deposition at 16-17, 28-29). In addition, Pierce testified that he did not know the written police department procedures for handling investigations. (Docket Entry No. 60-6 at 33).

Upon completion of an investigation, the City's department policies for securing an arrest warrant are as follows:

3.22 SECURING COMPLAINT AND WARRANT

When no previous warrant exists, it shall be the responsibility of the assigned officer to secure the:

A. Complaint

Alleging the felony offense and naming the suspect as the offender **by presenting all available information and facts to the committing magistrate.**

(Docket Entry No. 60-12, Policy Manual, § 3.22 at 115) (emphasis added).

Plaintiff also cites the City police department's written policies on maintaining records of incidents:

44

702 TIBRS-TENNESSEE INCIDENT REPORT BASED REPORTING
SYSTEM

. . . .

<u>VICTIM DATA</u>

. . . .

8. Aggravated Assault ...

. . . .

Remember, selections of circumstances should be based on information known to
law enforcement following their investigation... Always select the most
descriptive circumstances as determined by investigations.

(Docket Entry No. 60-12, Policy Manual, at 155, 159, 160).

The City of Centerville's policies and procedures are covered in the police academy

training, (Docket Entry No. 60-2, Jerry Simmons deposition at 36), and are reviewed at in-service

training or other meetings of officers. <u>Id</u>. at 6-7.

The City knew Pierce's violation of City procedures and the obvious consequence of

Plaintiff's arrest without probable cause. The City of Centerville allowed the arrest of Plaintiff to

continue until Pam Simmons and Cory Chandler admitted to the TBI that they did not see

Plaintiff with a gun at the McDonald's. From the deposition testimony of the officers, acting

chief, and mayor, a reasonable jury can conclude that inadequate training is obvious, and if left

unaddressed, is likely to result in further violations of constitutional rights so that an objective

person can only conclude that leadership of the municipality is deliberately indifferent to the

need for training.

A reasonable juror could find that the need for training on exculpatory evidence is

45

obvious, and that the inadequacy of training on exculpatory evidence resulted in Plaintiff's

unlawful arrest. A reasonable juror can also find that Acting Chief Carroll and Mayor Bohn, the

policymakers for the City of Centerville, were deliberately indifferent to the need for training on

exculpatory evidence.

There is no proof that any officer read and signed for his own copy of the written Police

Department Manual. According to Pierce, who self-assigned the Roberts investigation and

sought an arrest warrant for the adversary of his friend's family, he was unaware of any city

policy about self referral. Plaintiff's proof could lead the trier of fact to find a causal connection

of this failure to understand and implement the City's written policy and to ignore exculpatory

evidence and to rely on untrustworthy statements with less than a full investigation to cause

Plaintiff's wrongful arrest.

As to Plaintiff's claims that the City had a "policy which allowed Defendant Jerry

Simmons to hold the arrest warrant for 13 days after it was issued, and use it to assist Defendant

Jerry Simmons in a civil matter," Plaintiff's proof does not establish such a policy.

Plaintiff 's next claim is that the City failed to discipline Simmons, but Plaintiff does not

present proof of prior instances of misconduct without discipline to support this claim, and after

the TBI investigation, the city terminated Simmons. Thus, the only City policy at issue for trial

is the City's training of its officers on exculpatory evidence.

As to the Defendants' remaining contentions, punitive damages cannot be awarded

against a municipality, City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 266-271 (1981),

and "[e]xpert testimony is not required to prove serious mental injury, and proof may include a

plaintiff's own testimony as well as other lay witnesses." Winkler v. Petersilie, 124 Fed.Appx.

925, 934 (6ᵗʰ Cir. 2005) (citing <u>Miller v. Willbanks</u>, 8 S.W.3d 607, 615 (Tenn.1999)).

## C. CONCLUSION

Accordingly, the Court concludes that the motions for summary judgment as to all the Defendants should be denied, except for Plaintiff's claims on City policy on discipline and unlawful detention and Plaintiff's claims for punitive damages against the City. The Court, however, declines to exercise its supplemental jurisdiction over Plaintiff's state law claims, particularly given that TGTLA may govern such claims and TGTLA vests exclusive jurisdiction over TGTLA claims in the state court. <u>Beddingfield v. City of Pulaski</u>, 666 F.Supp. 1064 (M.D. Tenn. 1987), <u>*rev'd on other grounds*</u> 861 F.2d 968 (6th Cir. 1988).

An appropriate Order is filed herewith.

**ENTERED** this the ___5ᵗʰ___ day of November, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court